UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SANDRA TEDFORD
SHEILA TEDFORD,

            Plaintiffs,           CIVIL ACTION NO. 06-15392

        v.                  DISTRICT JUDGE PAUL V. GADOLA

TAYLOR POLICE OFFICER      MAGISTRATE JUDGE VIRGINIA MORGAN
SZOKOLA, TAYLOR POLICE
OFFICER SHEWCHUK, TAYLOR
POLICE OFFICER LT. MICHAEL
 ZACHARY, TAYLOR POLICE
OFFICER HILL,

            Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

       This matter comes before the court on Defendants' Motion for Summary Judgment (D/E

#15).  For the reasons stated below, this court recommends that defendants' motions be

**GRANTED IN PART**.  As conceded by plaintiffs, defendant Zachary should be dismissed from

this action.  Defendant Hill is entitled to qualified immunity on the claims against him and

should be granted summary judgment on that basis.  The excessive force and unlawful arrest

claims against defendants Szokola and Shewchuk should be allowed to proceed.

## II.  Background

### A. Factual Background

For ease of reference, the deposition transcripts attached to the parties' briefs will be

referred to as follows:

| | | |
|---|---|---|
| Dep I | = | Deposition of Sandra Tedford, August 6, 2007 (pp. 1-218 attached as Exhibit A to Plaintiffs' Response to Defendants' Motion for Summary Judgment) |
| Dep II | = | Deposition of Sheila Tedford, August 6, 2007 (pp. 1-158 attached as Exhibit B to Plaintiffs' Response to Defendants' Motion for Summary Judgment) |
| Dep III | = | Deposition of Jeffrey Shewchuk, August 23, 2007 (pp. 1-31 attached as Exhibit C to Plaintiffs' Response to Defendants' Motion for Summary Judgment; pp. 1, 17-21, 24-27 attached as Exhibit I to Defendants' Motion for Summary Judgment) |
| Dep IV | = | Deposition of David Szokola, August 23, 2007 (pp. 1-50 attached as Exhibit D to Plaintiffs' Response to Defendants' Motion for Summary Judgment; pp. 1, 6-8, 15-16, 18-19, 22-25, 28, 30, 32-35, 37-39 attached as Exhibit A to Defendants' Motion for Summary Judgment) |
| Dep V | = | Deposition of Nicolas Hill, August 23, 2007 (pp. 1-20 attached as Exhibit E to Plaintiffs' Response to Defendants' Motion for Summary Judgment; pp. 5-9, 12-17 attached as Exhibit J to Defendants' Motion for Summary Judgment) |

This case arises out of an incident that occurred on December 10, 2003 at a Wal-Mart in

the city of Taylor, Michigan.  The complaint alleges that on that date, sisters Sandra Tedford

("Sandra") and Sheila Tedford ("Sheila"), accompanied by some of their respective children,

went to the Wal-Mart to do some shopping (Dep I, pp. 101-103; Dep II, p. 28).  In the store,

Sandra and Sheila went their separate ways with separate shopping carts (Dep I, p. 103; Dep II,

p. 28).  Sandra finished her shopping, paid for her purchases and left the store (Dep I, p. 105).

She then waited outside with her daughter for the others to come out  (Dep I, p. 105).

Sheila alleges that while shopping, she found a purse that she thought might purchase,

but when she opened it she found a person's wallet and other property inside (Dep II, pp. 31, 33).

Sheila states that she turned the purse over to a Wal-Mart employee and proceeded to the check-

out line (Dep II, p. 37).  While she was in line, a man asked Sheila to show him where she found

the purse, which she did (Dep II, pp. 39, 42).  Sheila returned to the check-out line and,

eventually, purchased her items with cash (Dep II, p. 38).

### 1. Near the entrance/exit of the store[1]

**a.  Sheila's Deposition Testimony**

At the exit, either Szokola or Shewchuk asked Sheila to step back into the store (Dep II,

p. 43).  Sheila got a "little bit agitated" because it was almost three o'clock and she had kids at

home, and because she thought she was being asked about purchases she had already made (Dep

II, p. 46).  While talking, Sheila was loud, but states that she was not screaming or swearing

(Dep II, pp. 46-47).  She did walk to the service desk as directed (Dep II, p. 46).  At the desk,

Shewchuk pointed to woman and told Sheila that the woman had said Sheila stole her money and

credit cards (Dep II, p. 53).  Shewchuk also said that a female police officer was coming to

search Sheila (Dep II, p. 53).  Sheila said "Look, you can check me" and proceeded to take off

some of her clothes (Dep II, p. 54).  Sheila also told the woman accusing her to check her, but

she did not (Dep II, p. 55).

---

[1]A security video of the events near the entrance/exit to the store was provided by
defendants as Exhibit L to their Motion for Summary Judgment.  The video was filed in the
traditional manner and sent directly to the court (D/E #26).

Meanwhile, Sandra was yelling across the store "hollering about seizures" (Dep II, pp. 63-64). Sheila suffers from seizures and Sandra was trying to calm her down because Sandra was worried Sheila would have a seizure (Dep II, p. 64). Sheila also heard the police ask Sandra to leave the store twice (Dep II, p. 77).

Sheila heard a "commotion" involving her sister (Dep II, p. 55). She looked over and saw Szokola take Sandra down, but it was very quick (Dep II, p. 82). She saw Sandra on the ground (Dep II, p. 56), but she did not see the police detain Sandra because it all happened so fast (Dep II, pp. 80-81). According to Sheila, after seeing Sandra with the police, Sheila was "about to lose [her] mind" (Dep II, p. 94). Sheila started screaming (Dep II, p. 56). She also started crying and rambling (Dep II, pp. 66-67). Specifically, she started saying "Y'all going to kill my sister. Get off of her. Get off of her now" (Dep II, p. 95). Sheila then urinated on herself (Dep II, p. 96). Szokola subsequently came over to the service desk and handcuffed Sheila (Dep II, p. 100). He then "shuffled" her back to the Loss Prevention Area (Dep II, p. 104).

According to Sheila, both she and the police officers could have handled things better (Dep II, p. 62). She could have handled things better by being more sedate and appeasing (Dep II, p. 62). Sheila thinks at one point she may have said: "If it had been a white woman, they would not have stopped her and tried to check her. They would have did something different. They would not have demeanored (sic) her in front of all those people" (Dep II, p. 60). The crowd watching the incident was over fifty people (Dep II, p. 59).

### b. Sandra's Deposition Testimony

According to Sandra, she returned to the store after waiting for ten minutes (Dep I, pp. 105-106). Inside the store, Sandra observed Shewchuk[2] speaking with Sheila (Dep I, p. 108). Szokola was standing nearby (Dep I, p. 114). Sandra asked Shewchuk what was going on and he told her that Sheila had found a purse and was accused of stealing credit cards and money from that purse (Dep I, pp. 110-111). Shewchuk also told Sandra that Sheila had purchased merchandise with the stolen credit cards (Dep I, p. 111). Sandra asked Shewchuk if he had looked at Sheila's receipt and Shewchuk responded by asking who Sandra was (Dep I, p. 111). After identifying herself, Sandra asked whether he was taking Sheila to jail and Shewchuk responded that he did not know yet (Dep I, p. 111-112). Shewchuk also told Sandra: "I want you to turn around and leave the store" (Dep I, p. 112). Sandra informed Shewchuk that Sheila suffered from grand mal seizures and that Sandra and Sheila had to pick up Sheila's medicine that day after leaving the store and picking up their children from school (Dep I, p. 114). Shewchuk told Sandra that he needed to know how Sheila purchased her merchandise and they checked the receipt together; Sheila had purchased her merchandise with cash (Dep I, p. 115).

According to Sandra, Shewchuk then said that, while he was not sure how long Sheila was going to have to be there, Sandra could leave the store (Dep I, p. 115). Sandra expressed

---

[2]In her deposition testimony, Sandra did not identify the first police officer at the scene of the incident by any name and she could not be sure if it was Shewchuk simply by looking at him (Dep I, pp. 108-109). During her deposition, Sandra repeatedly acknowledged that she could not positively identify the officer (Dep I, pp. 108-110, 113-114, 116, 118-121, 125-127). However, while the parties dispute certain facts in their briefs, they appear to agree that Sandra is referring to Shewchuk and neither brief references Sandra's inability to identify one of the officers by name. Moreover, the other depositions taken in this matter suggest that Sandra is referring to Shewchuk. This report and recommendation will likewise identify the police officer that Sandra first saw as Shewchuk when describing her deposition testimony.

concern about her sister and Shewchuk responded: "Well, I need you to turn around and leave the store" (Dep I, p. 115). At the same time, Sheila was talking and denying that she had stole anything (Dep I, p. 115). Sheila also asked her accuser to search her, but the police were waiting for a female officer to search Sheila (Dep I, p. 116). Sandra said she would wait in the car and started walking out of the store with her daughter (Dep I, p. 116). As she was walking out, at her normal pace, she turned her head and Shewchuk said: "Don't turn around, go straight out the store" (Dep I, p. 117). Sandra got beyond the door before turning her head back again (Dep I, p. 117). Shewchuk then came at her and told her "You're walking too slow, you're going to jail" (Dep I, pp. 117, 120). Shewchuk grabbed her right arm and put it behind her back (Dep I, pp. 127-128, 132). Sandra said "oh, that hurt" and asked about her daughter (Dep I, p. 133). Shewchuk said that Sandra was as strong as an ox and called for backup (Dep I, p. 133). Police officers, including Szokola slammed Sandra to the floor (Dep I, p. 134). While on the floor, she was handcuffed tightly and Szokola kicked her two times (Dep I, pp. 134, 149). Sandra's eyes became too teary to see out of and she screamed that she could not breathe (Dep I, p. 136). She also cried and worried about her daughter (Dep I, p. 142).

In reference to the entire incident, Sandra testified that she never screamed, yelled or swore in the store (Dep I, p. 161). However, she also stated that she screamed out to the crowd of people watching, asking them to call her lawyer (Dep I, p. 163). She did not say anything else to the crowd (Dep I, 164). Sandra estimated that the crowd was forty to fifty people (Tr. 163). Regarding the crowd, Sandra did not know if they were all watching the incident or just passing by (Dep I, p. 206). Sandra also stated that she never struggled or fought with any police officers

(Dep I, p. 162). She did, but she is not sure when, say that the only reason she and Sheila were arrested was because they were black (Dep I, pp. 205-206).

### c. Szokola's Deposition Testimony

On December 10, 2003, Szokola and Shewchuk were dispatched to Wal-Mart regarding a possible larceny (Dep IV, pp. 6-7). After they arrived, Szokola observed Sheila, Sandra and Sandra's daughter Katie Tedford leaving the store (Dep IV, p. 8). Szokola asked them to step back inside so he could speak with them (Dep IV, p. 8). Almost simultaneously, Szokola spoke with Teodora Djourova, the woman whose purse Sheila had found, who pointed out Sheila as the person who found her purse (Dep IV, pp. 15-16). Djourova also told Szokola that she had tried to speak with Sheila and Sandra, but they refused to speak with her and, instead, became disorderly (Dep IV, pp. 15-16).

Szokola asked Sandra and Sheila[3] about the purse while explaining that he was not accusing them (Dep IV, p. 18). Sheila responded "What the fuck, we helped the bitch out and you gonna ask me that bullshit?" (Dep IV, p. 18). Szokola tried to keep both Sheila and Sandra calm by explaining that he was just investigating, but they got angry (Dep IV, pp. 19, 22). Szokola advised Sheila and Sandra to stop screaming and to stop yelling profane and racist comments, comments which were drawing a crowd (Dep IV, p. 22). Szokola asked to look in Sheila's purse and she responded "Oh yeah, I have the money, go ahead and check you white motherfucker" (Dep IV, p. 22). Szokola checked Sheila's purse[4] and, after finding nothing, told her she was free to go (Dep IV, pp. 23-24).

---

[3]Szokola also testified that he only spoke with Sheila initially (Dep IV, p. 22).

[4]Szokola also testified that he did not remember who checked the purses (Dep IV, p. 41).

-7-

Instead of leaving, Sheila became more disorderly, and she screamed and swore (Dep IV, p. 24). Sandra and Katie Tedford were also asked if their purses could be checked (Dep IV, p. 24), which caused them to start screaming, swearing, and calling the officers names (Dep IV, p. 25). A large crowd of seventy-five to one hundred people started to gather around (Dep IV, p. 25).

Szokola asked Sheila and Sandra to calm down and warned them that they would be arrested if they swearing (Dep IV, p. 25). Sandra was asked to leave several times, but she just kept screaming "Fuck you, you white motherfuckers, you racist pigs, you racist white cops" (Dep IV, p. 28). Szokola warned Sandra that she either had to leave or go to jail, but she continued to scream, yell and swear as she slowly walked toward the door (Dep IV, p. 28). At that point, Shewchuck advised Sandra that she was under arrest (Dep IV, p. 28). Shewchuck walked over to Sandra and tried take hold of her arm, but she turned around and swung at him (Dep IV, p. 30). Shewchuk pushed Sandra back in order to disengage or to gain leverage (Dep IV, p. 32). Szokola and he took Sandra to the ground by tackling her from the side (Dep IV, p. 32). Sandra had her arms tucked beneath her body while she resisted (Dep IV, pp. 33-34). Szokola pulled Sandra's arms out from underneath her, put them behind her back, and handcuffed her (Dep IV, pp. 33-34). Szokola helped Sandra off the ground and turned over to one of the officers who had just arrived (Dep IV, pp. 37-38). Szokola charged Sandra with inciting a riot, interfering with a police officer, and disorderly person (Dep IV, p. 43). The crowd allegedly numbered over a hundred by the time Sheila was arrested (Dep IV, p. 40). A black male in the crowd was jeering and yelling (Dep IV, p. 38).

Sheila rushed up behind Szokola and he advised her to back up (Dep IV, p. 34). Szokola also heard Sheila tell the crowd: "Come up, people, let's jump these white motherfuckers" (Dep IV, p. 33). Szokola then observed Sheila try to attack Djourova before being restrained by Katie (Dep IV, pp. 35, 37). Sheila was still screaming and the crowd was still growing, so Szokola advised her she was under arrest (Dep IV, p. 38). Sheila replied "Try to arrest me, white boy" (Dep IV, p. 38). Szokola grabbed her arms and handcuffed her (Dep IV, p. 38). Sheila tried to pull away while yelling "Someone punch this motherfucking white boy" (Dep IV, pp. 38-39).

**d. Shewchuk's Deposition Testimony**

After Shewchuk and Szokola arrived at the Wal-Mart, Shewchuk spoke with Djourova (Dep III, pp. 12-13). She pointed out the females who had found her purse as they were exiting the store (Dep III, pp. 13-14). Shewchuk spoke with Sheila and asked if it was okay if he checked her purse in order to eliminate her as a suspect (Dep III, p. 15). Sheila said yes, but sarcastically (Dep III, p. 15). Shewchuk checked the purse and found nothing (Dep III, p. 16). Sandra started getting loud and using profanity; she also said "white boys" had no business harassing them (Dep III, p. 17). Shewchuk advised her several times to watch her language (Dep III, p. 18). Sheila also started screaming and using profanity (Dep III, p. 18).

Shewchuk grew concerned as a crowd of seventy-five to one hundred people started watching (Dep III, p. 18). Sandra kept using profanity even after Shewchuk told her to get out of the store (Dep III, pp. 18-19). She started slowly leaving, but she continued using profanity. (Dep III, p. 18-19). Shewchuk did not think she was really leaving, so he told her she was under arrest (Dep III, p. 19). Sandra kept walking (Dep III, p. 19). Shewchuk took a hold of one of Sandra's arms and she turned around and swung at him with a closed fist (Dep III, p. 19).

Sandra missed and Shewchuk and Szokola took her down (Dep III, pp. 19-20).  Sandra was

handcuffed (Dep III, p. 21).  While handcuffed, Sandra continued to scream for the crowd to

assault the police officers and that the police officers were racist.  The crowd was screaming as

well.  (Shewchuk's Deposition, p. 27).  Shewchuk looked up and saw he was surrounded by

black people (Dep III, p. 21), though the Wal-Mart security was between him and the crowd

(Dep III, p. 23).  Shewchuk called for backup (Dep III, p. 21).[5]

## 2. In the Loss Prevention Office

### a.  Sheila's Deposition Testimony

After being "shuffled" in to the Loss Prevention Office by Szokola, Szokola threw Sheila

into a chair and pushed her face into a cabinet (Dep II, pp. 104, 111-112).  Her face started

bleeding (Dep II, p. 112).

### b. Sandra's Deposition Testimony

Sandra testified that while in the security office, she observed Szokola take Sheila, while

Sheila was handcuffed, and smack her head into a brick wall (Dep I, pp. 154-155).

### c. Shewchuk's Deposition Testimony

---

[5]In support of their motion for summary judgment, defendants also provided witness
statements regarding the incident in the store as exhibits (Exhibits B-D, F-H).  However, this
report and recommendation will not address the witness statements because they are
inadmissible hearsay.  Defendants argue that the witness statements are present sense
impressions and, therefore, fall under the exception to the hearsay rules found in Fed. R. Evid.
803(1), but the statements were all made after the incident, sometimes days later, and there is no
indication that the statements were made "while the declarant was perceiving the event or
condition, or immediately thereafter" as required by Fed. R. Evid. 803(1).

Shewchuk does not recall being in the Loss Prevention Office (Dep III, pp. 27-28).

**2. Outside the Store**

**a. Sheila's Deposition Testimony**

According to Sheila, while a police officer said something about her kicking him while going out to the police car, she never kicked a police officer (Dep II, pp. 117-118). She also stated that she did not give the officers a problem while getting into the car (Dep III, p. 121). On the way to the police station, she was told to shut up several times (Dep III, p. 122). She also asked for her seizure medication at the station, but a police officer told her to "have a seizure" (Dep III, p. 126).

**b. Hill's Testimony**

Hill arrived at the store after responding to call for help from either Szokola or Shewchuk (Dep V, pp. 5-6). When Hill arrived, there was a large crowd at the front entrance (Dep V, pp. 6). Hill was told to transport plaintiffs to Taylor Police Department (Dep V, p. 8). Sheila and Sandra were already in handcuffs and Hill was told they had been disorderly (Dep V, pp. 5, 9). On the way out of the store, Sheila fell to the ground and started flailing on the ground while yelling that the police were beating her (Dep V, p. 10). She stopped once she realized that no one was paying attention (Dep V, p. 10). Hill escorted Sheila outside of the store and she kicked him in the shin (Dep V, pp. 12-13). Hill grabbed Sheila and pushed her up against the trunk so she could not turn around and kick him (Dep V, p. 13). Another officer opened the door and they were able to get Sheila in the car (Dep V, p. 13). Sheila and Sandra were yelling and screaming in the car on the way to the police station, but Hill just ignored them while basically

laughing with the other police officer (Dep V, p. 15). After transporting Sheila and Sandra to the police station, Hill had no further problems with them (Dep V, p. 16).

**B. Procedural History**

On December 5, 2006, plaintiffs filed a complaint against defendants pursuant to 42 U.S.C. § 1983 (D/E #1). In that complaint, plaintiffs allege that defendants "subjected Plaintiffs to depravation (sic) of their rights, privileges and immunity secured by the Constitution of the United States and, more specifically, Amendment 4 of the laws of the United States and the State of Michigan." (Complaint, ¶ 16) Plaintiffs also alleged that:

> Defendants, in their individual capacity, proximately caused the injuries and losses to Plaintiffs, by the use of excessive force and illegal and wrongful search and seizure, as alleged herein thereby depriving Plaintiffs of their rights, privileges and immunities secured by the United States Constitution and Amendment 4, due to their practice of stopping and detaining African-Americans and using excessive force upon such minorities. [Complaint, ¶ 17]

On October 31, 2007, defendants filed the motion for summary judgment pending before the court (D/E #15). In that motion, defendants argue that they are entitled to summary judgment on the basis of qualified immunity because no genuine issue of exists regarding whether plaintiffs' constitutional rights were violated and, even if there was a genuine issue of material fact in dispute, plaintiffs' rights in this case were not clearly established.

On December 4, 2007, plaintiffs filed a response to defendants' motion for summary judgment (D/E #17). In that response, plaintiffs argue that defendants are not entitled to summary judgment or qualified immunity. Specifically, plaintiffs argue that the evidence in this case shows that Szokola, Shewchuk and Hill participated in an illegal arrest while lacking

probable cause to do so and that they used excessive force against plaintiffs.  Plaintiffs also argue that their rights were clearly established.

On January 8, 2008, defendants filed a reply to plaintiffs' response to defendants' motion for summary judgment (D/E #22).  In that reply, defendants argue that, given plaintiffs' failure to mention Zachary in their response, there is clearly no genuine issue of material fact with respect to the claims against him and he is entitled to summary judgment.  Defendants also argue that Hill did not take part in the arrest and that, under the circumstances of this case, his use of force against Sheila was reasonable.  Defendants further argue that plaintiffs' claims that Szokola and Shewchuk arrested them without grounds to do so and that the police used excessive force against them hold no ground given the evidence provided by defendants.

On February 13, 2008, defendants filed a supplemental brief to their motion for summary judgment (D/E #23).  In that supplement, defendants argue that the DVD of the Wal-Mart security video recording contradicts plaintiffs' version of the events of this case.

### III.  Standard of Review

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move without or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the court must view the evidence and

draw all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial

Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see

also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).  The moving

party bears the initial burden of demonstrating the absence of a genuine issue of material fact.

Once the moving party has carried his burden, the party opposing the motion "must come

forward with specific facts showing that there is a genuine issue for trial."  Matsushita, 475 U.S.

at 587, 106 S.Ct. 1348.  The opposing party cannot merely rest upon the allegations contained in

his pleadings.  Rather, he must submit evidence demonstrating that material issues of fact exist.

Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, quoting First

National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

## IV.  Discussion

As a preliminary matter, it should be noted that plaintiffs' counsel conceded at oral

argument that defendant Zachary should be dismissed from this action because he had no contact

with plaintiffs.  However, plaintiffs still assert that the other defendants are not entitled to

qualified immunity or summary judgment.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of

litigation."  Saucier v. Katz, 533 U.S. 194, 200; 121 S.Ct. 2151; 150 L.Ed.2d 272 (2001), quoting

Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).  The privilege is

an immunity from suit and not a mere defense to liability.  Saucier, 533 U.S. at 200.  As a result,

courts have "repeatedly have stressed the importance of resolving immunity questions at the

earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

"A court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" Flint ex rel. Flint v. Kentucky Dept. of Corrections, 270 F.3d 340, 346-347 (6th Cir. 2001) quoting Poe v. Haydon, 853 F.2d 418, 425-426 (6th Cir. 1988). A court required to rule upon the qualified immunity issue must first consider whether the facts alleged show the officer's conduct violated a constitutional right. Saucier, 533 U.S. at 201. If a violation could be shown, the court must then ask whether that constitutional right was clearly established. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." Saucier, 533 U.S. at 201.

### A. Constitutional Violations

In their response, plaintiffs argue that Szokola and Shewchuk unlawfully arrested them and that Szokola, Shewchuk and Hill used excessive force against them.

#### 1. Unlawful Arrest Claims

To state a cause of action under 42 U.S.C. § 1983 with respect to an arrest, the plaintiff must show that the arrest constituted an unlawful deprivation of civil rights. Since an arrest is valid if it is made either pursuant to a valid warrant or with probable cause, the plaintiff ordinarily must allege that the arrest was made without a warrant and without probable cause to

believe that the plaintiff had committed or was committing a crime.  In <u>Swiecicki v. Delgado</u>,

463 F.3d 489, 498 (6th Cir. 2006), the Sixth Circuit stated:

> In order for the arrest to survive constitutional scrutiny, Delgado must have had probable cause to believe that Swiecicki committed the offenses charged.  *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (holding that the defendant officers were entitled to qualified immunity "if a reasonable officer could have believed that probable cause existed" to make the arrest).  In determining whether Delgado had probable cause to arrest Swiecicki for disorderly conduct, we must decide whether, "at that moment [of the arrest], the facts and circumstances within [his] knowledge and of which [he] had reasonably trusty information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).
>
> Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry. *See St. John v. Hickey*, 411 F.3d 762, 770 (6th Cir. 2005) (holding that genuine issues of material fact precluded summary judgment on qualified immunity grounds).  An officer may not base his probable-cause determination on speech protected by the First Amendment.  *See Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir.1997).  But to the extent that probable cause existed for either of Swiecicki's charges (disorderly conduct or resisting arrest), the arrest was lawful with respect to the probable-cause requirement. *See Lyons v. City of Xenia*, 417 F.3d 565, 573-75 (6th Cir.2005) (granting qualified immunity to the defendant officers on the plaintiff's probable-cause claim).

In the motion for summary judgment, defendants state that Szokola and Shewchuk had

probable cause to find that plaintiffs had committed the offenses of "disorderly" and "inciting a

riot."  (Defendants' Brief in Support of Motion for Summary Judgment, p. 11)[6]  However,

---

[6]Defendants also assert that Szokola and Shewchuk believed that there was an outstanding arrest warrant for Sheila at the time she was arrested, but, as conceded by defense counsel at oral argument there is no evidence suggesting such knowledge in their deposition testimony.

defendants completely fail to discuss the elements of such offenses or to even identify the state statutes or city ordinances that plaintiffs are alleged to have violated.[7]  Instead, defendants simply point to their version of the facts, including testimony that plaintiffs were yelling, screaming, cursing and acting disorderly in addition to calling on a crowd of black people to attack the white cops.

Plaintiff' evidence directly contradicts defendants' evidence.   According to Sheila, she cooperated with the police and asked them to check her (Dep II, pp. 46-47, 54).  When she did start to scream, it was out of fear for her sister (Dep II, pp. 56, 66-67, 94-95) and, while she was worried about Sandra, Sheila waited at the service desk until Szokola subsequently arrested her (Dep II, p. 100).  According to Sandra, after she and Shewchuk checked Sheila's receipt together, Shewchuk told her she could leave the store, but he did not say she had to leave (Dep I, p. 115).  Sandra then expressed concern about her sister and Shewchuk told her to leave the store

_____

[7]With regard to inciting a riot, both Taylor, Mich., Ordinance § 19-196 and M.C.L. § 752.542 provide that "[i]t is unlawful and constitutes incitement to riot for a person or persons, intending to cause or to aid or abet the institution or maintenance of a riot, to do an act or engage in conduct that urges other persons to commit acts of unlawful force or violence, or the unlawful burning or destroying of property, or the unlawful interference with a police officer, peace officer, fireman or a member of the Michigan national guard or any unit of the armed services officially assigned to riot duty in the lawful performance of his duty."

With regard to the offense of "disorderly", while M.C.L. § 750.167(1) provides the definition of "Disorderly person" for purposes of Michigan state law, none of the described persons appear applicable to this case.  M.C.L. § 750.167(1)(f) provides that the definition of "Disorderly person" includes "[a] person who is engaged in indecent or obscene conduct in a public place" but the Sixth Circuit has stated that "[w]e understand indecent or obscene as regulated in § 750.167(f) as regulating 'conduct consisting of exposing private body parts when one reasonably might expect that they would be viewed unwantedly by others,' and not speech." Leonard v. Robinson, 477 F.3d 347, 359 (6th Cir. 2007), quoting United States v. Whitmore, 314 F.Supp.2d 690, 698 (E.D.Mich. 2004) (Lawson, J.).  Taylor, Mich., Ordinance § 19-186 provides that "[i]t shall be unlawful for any person within the city to disturb the peace and quiet by loud, boisterous or vulgar conduct.

(Dep I, p. 115), which she started to do with her daughter (Dep I, p. 116).  After Sandra got beyond the door, she turned her head back again and Shewchuk came to arrest her (Dep I, p. 117).  Both plaintiffs testified that there was a crowd of at least forty people around during the incident (Dep I, p. 163; Dep II, p. 59), but Sandra did not know if they were all watching the incident or just passing by (Dep I, p. 206).  Sandra only acknowledged screaming out to the crowd of people in order to ask them to call her lawyer (Dep I, p. 163) and, while it is not clear when she did so, she may not have done so until after she was arrested.  The video of this incident displays people entering and exiting the store, but it does not show a crowd of people watching plaintiffs and defendants (D/E #26).

As noted above, in deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant.  See B.F. Goodrich Co., 245 F.3d 591-92.  In this case, viewing the above evidence and drawing all reasonable inferences in favor of plaintiffs, a genuine issue of material fact exists as to whether Szokola and Shewchuk unlawfully arrested plaintiffs.  Defendants rely solely on their version of events, but that version is directly contradicted by plaintiff's testimony.  The video of the incident is inconclusive with respect to determining the issue as a matter of law.

## 2. Excessive Force Claim

The Fourth Amendment's "objective reasonableness" standard governs the constitutional analysis in excessive force claims in the context of an arrest, investigatory stop, or other seizure. Brosseau v. Haugen, 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); Pigram ex rel. Pigram v. Chaudoin, 199 Fed. Appx. 509, 512 (6th Cir. 2006). In Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. Courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The reasonableness must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

### a. Shewchuk

Shewchuk is only alleged to have used excessive force against Sandra. Specifically, Sandra testified that Shewchuk grabbed her right arm and put it behind her back (Dep II, pp. 127-128, 132), and that Shewchuk took part in slamming Sandra to the ground and handcuffing her tightly (Dep II, pp. 134, 149). Defendants argue that Shewchuk reasonably used force when arresting Sandra.

Viewing the evidence and drawing all reasonable inferences in favor of plaintiffs, as the court must, a genuine issue of material fact exists with respect to whether Shewchuk used excessive force. First, while Sandra admits to screaming at one point, she testified that she did not incite the crowd or resist arrest. "The crime of disorderly conduct" generally "is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [someone for such conduct]." <u>Thacker v. Lawrence County</u>, 182 F. Appx 464, 472 (6th Cir. May 17, 2006). Second, nothing currently before the court suggests that Sandra posed a threat to the officers as she was leaving the store with her daughter as ordered. Whether the force used was constitutionally excessive is a matter of fact and cannot be decided on summary judgment.

### b. Szokola

Szokola is alleged to have used excessive force against both Sandra and Sheila. Specifically, Sandra testified that Szokola assisted in slamming her to the ground and kicked her when she was on the ground (Dep I, pp. 134, 139). Sheila testified that, after Szokola brought her to the Loss Prevention Office, Szokola threw Sheila into a chair and pushed her face into a cabinet and her fact started bleeding (Dep II, pp. 104, 111-112). In the security office, Sandra observed Szokola take Sheila, while Sheila was handcuffed, and smack her head into a brick wall (Dep I, pp. 154-155). Szokola argues that his use of force against Sandra was reasonable under the circumstances, but he makes no argument and his deposition testimony does not address the events in the Loss Prevention Office.

Viewing the evidence and drawing all reasonable inferences in favor of plaintiffs, as the court must, a genuine issue of material fact exists with respect to whether Szokola used excessive force.

### c. Hill

In plaintiffs' brief, they argue that Hill used excessive force against Sheila outside the Wal-Mart by shoving her up against the police car while she was handcuffed and under his control. However, neither Sheila nor Sandra ever testified that such an event occurred. Hill testified that, after Sheila kicked him in the shin, he grabbed Sheila and pushed her up against the trunk so she could not turn around and kick him (Dep V, pp. 12-13). Sheila denies kicking Hill (Dep II, pp. 117-118), but she did not testify that Hill shoved her against the police car. Thus, no evidence supports the claim that Hill used excessive force and he is entitled to qualified immunity and summary judgment.

### B.  Clearly Established Rights

As discussed above, even if a genuine issue exists with respect to whether defendants violated plaintiffs' constitutional rights, defendants would still be entitled to qualified immunity and summary judgment if plaintiffs' rights were not clearly established. To ascertain whether a right is clearly established, a court in the Sixth Circuit generally look to "preexisting law," Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), as established by decisions of the Supreme Court, the Sixth Circuit and other courts, see Baker v. City of Hamilton, Ohio, 471 F.3d 601, 606 (6th Cir.2006). The "hypothetical reasonable officer" used to determine whether a defendant should have known "that his actions ... were objectively unreasonable," Scott v. Clay County, Tenn., 205 F.3d 867, 877 (6th Cir.2000), is therefore an officer who is aware of the relevant case law.

Moreover, in Brosseau v. Haugen, 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), the Court stressed that the qualified immunity inquiry "must be undertaken in light of the

specific context of the case, not as a broad general proposition." <u>Brosseau</u>, 125 S.Ct. at 599

(quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For

example, although precedent "establishes the general proposition that use of force is contrary to

the Fourth Amendment if it is excessive under objective standards of reasonableness," that is

"not enough" to deny qualified immunity because "the right the official is alleged to have

violated must have been 'clearly established' in a more particularized, and hence more relevant,

sense." <u>Brosseau</u>, 125 S.Ct. at 599, quoting <u>Saucier</u>, 533 U.S. at 201. <u>See also</u> <u>Lyons v. City of

Xenia</u>, 477 F.3d 565, 572 (6th Cir. 2005).

"<u>Brosseau</u> leaves open two paths for showing that officers were on notice that they were

violating a "clearly established" constitutional right--where the violation was sufficiently

'obvious' under the general standards of constitutional care that the plaintiff need not show 'a

body' of 'materially similar' case law, . . . and where the violation is shown by the failure to

adhere to a 'particularized' body of precedent that 'squarely govern[s] the case here,'" <u>Lyons</u>,

417 F.3d at 579, quoting <u>Brosseau</u>, 125 S.Ct. at 599.

In an obvious case, where a general constitutional rule applies with "obvious clarity" to a

particular case, factually similar decisional law is not required to defeat a claim of qualified

immunity. <u>United States v. Lanier</u>, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

General statements of the law are sometimes capable of giving fair and clear warning, and, in

other instances, "a general constitutional rule already identified in the decisional law may apply

with obvious clarity to the specific conduct in question, even though 'the very action in question

has [not] previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 740-741; 122 S.Ct.

2508 (U.S. 2002) (citations omitted).

### 1. Unlawful Arrest Claims

"It is clearly established that an arrest without probable cause violates the Fourth Amendment." <u>Donovan v. Thames</u>, 105 F.3d 291, 298 (6th Cir. 1997), citing <u>Beck v. Ohio</u>, 379 U.S. 89, 90-91, 85 S.Ct. 223, 225-26, 13 L.Ed.2d 142 (1964). Probable cause is, in this case, an issue of fact for the jury to resolve. See, <u>St. John v. Hickey</u>, 411 F.3d 762 (6th Cir. 2005).

### 2. Excessive Force Claims

As discussed above, whether the force used was reasonable presents issues of fact that must be resolved by a jury.

## V.  Conclusion

For the reasons discussed above, the court recommends that defendants' motions be **GRANTED IN PART**. As conceded by plaintiffs, defendant Zachary should be dismissed from this action. Defendant Hill is entitled to qualified immunity on the claims against him and should be granted summary judgment on that basis. The excessive force and unlawful arrest claims against defendants Szokola and Shewchuk should be allowed to proceed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508 (6th Cir. 1991); <u>United States v. Walters</u>, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir.

1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

       Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

<u>s/Virginia M. Morgan               </u>
Virginia M. Morgan
United States Magistrate Judge

Dated:  June 26, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on June 26, 2008.

<u>s/Jane Johnson</u>
Case Manager to
Magistrate Judge Virginia M. Morgan